TOTTEN, Inspector, v. PITTSBURGH MELTING CO.

(Circuit Court of Appeals, Third Circuit. May 22, 1916.)

No. 2093.

FOOD ⬅3—MEAT INSPECTION—STATUTORY PROVISIONS.

Under Meat Inspection Acts (Act June 30, 1906, c. 3913, 34 Stat. 674; Act March 4, 1907, c. 2907, 34 Stat. 1260), the Secretary of Agriculture made regulations that a shipper of meat food products must certify that the product is not capable of being used as food by man, is suitable only for industrial purposes, and is of such character, or for such use, that denaturing is impracticable. The act declares that no meat food product can be shipped or carried in interstate commerce unless it has been first inspected, examined, and marked as inspected and passed in accordance with the terms of the act and the rules and regulations prescribed by the Secretary of Agriculture. Complainant rendered oil from beef fat in machinery which had been used to produce oleo oil, used in making oleomargarine. Held, that complainant's oil was a food product, though it was not used for making oleomargarine, but was shipped abroad for other purposes, and therefore could not be shipped under the act, unless inspected or denatured; the fact that the oil was uncooked, and would not be eaten until mixed with other substances, not preventing it from being a "food."

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 3, 4; Dec. Dig. ⬅3.

For other definitions, see Words and Phrases, First and Second Series, Food.]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Bill in equity by the Pittsburgh Melting Company against G. E.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Totten, Inspector. From a decree for complainant (229 Fed. 214), defendant appeals. Reversed, with instructions to dismiss.

E. Lowry Humes, U. S. Atty., and B. M. Price, Asst. U. S. Atty., both of Pittsburgh, Pa., for appellant.

Samuel McClay, Wm. M. Robinson, and Reed, Smith, Shaw & Beal, all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The decree of the court below enjoined the Baltimore & Ohio Railroad Company and G. E. Totten, an inspector in the service of the Department of Agriculture, from interfering with certain export shipments of the Pittsburgh Melting Company. A full statement of the controversy will be found in 229 Fed. at page 214. Much that is there said need not be referred to now: in our opinion the decision of the present appeal turns upon a question of fact, and merely requires us to state briefly our conclusions upon that question. In a few preliminary words, the situation is this:

For many years the Melting Company and its predecessors in business have been engaged in rendering, or converting, the fat of animals—chiefly, if not altogether, the fat of cattle, as we understand the evidence—into oil, stearine, tallow, cracklings, and grease. Nothing except the oil is now in question; this, in the view of the company, is "tallow oil," while the government describes it as "oleo oil," the substance that is the basic constituent of oleomargarine. At one time the company was engaged in making oleomargarine; about 30 years ago, however, hostile Pennsylvania legislation compelled it to abandon the business, but the fact appears, and is relevant, that the oil now in question is made by the same appliances that the company then used. About 90 per cent. of the company's oil is carried to New York over the Baltimore & Ohio Railroad, and is shipped from there to Holland and one or two other European countries. During several years after the Meat Inspection Acts went into effect (34 Stat. 674, 1260), the plant of the Melting Company was under government inspection, but the inspection was withdrawn in 1909 in consequence of a disagreement that need not now be gone into. In 1910 the company was indicted for a violation of the act, but was acquitted. As a result of the verdict, the company discontinued a proceeding in equity that was then pending between the same parties and involved substantially the same subject-matter as is now before the court. During the next 5 years the company shipped its oil abroad as an inedible fat, and was not interfered with by the Department. The tierces were labeled "Inedible," and in other respects the regulations of the Department then in force were complied with. But on November 1, 1914, new regulations, went into effect, and among them was a requirement that a shipper of meat food products must certify that the product—

" * * * is not capable of being used as food by man, is suitable only for industrial purposes, is not for food purposes, and is of such character or for such a use that denaturing is impracticable."

This revived the disagreement, and in January, 1915, the company, while attempting to ship its oil under the old regulations, was prevented from doing so, until the District Court restrained the defendants by preliminary, and afterwards by final, injunction. The· scope of the decree is sufficiently apparent from the opinion in 229 Fed., where it also appears that the vital question in the case is whether the oil in dispute is, or is not, a meat food product.

By the express language of the act, no meat food product can be shipped or carried in interstate or foreign commerce unless it has first been—

" * * * inspected, examined, and marked as 'inspected and passed,' in accordance with the terms of this act and with the rules and regulations prescribed by the Secretary of Agriculture."

If, therefore, the oil is a meat food product, the statute denied it the right to be carried, for concededly it had neither been inspected, nor examined, nor officially marked. If it is not a meat food product, it is not included in the act at all. In considering this question, we remark, first, that the substance under inquiry is clearly proved to be "oleo oil." Apparently there is little, if any, chemical difference between tallow oil and oleo oil; but they differ distinctly in methods of manufacture, and in appearance, taste, and smell. As already stated, the plaintiff makes its oil by the same machinery that was formerly used in the manufacture of oleomargarine; moreover, it is made by the process that is appropriate for rendering oleo oil, and not by the process employed for rendering tallow oil; and, finally, it exhibits all the characteristics of the former substance. Whatever name one may choose to give it, the evidence leaves us no room to doubt what it really is.

Being oleo oil, therefore, is it a meat food product? It is, of course, a meat product. Is it a food? In its condition as an oil immediately after rendering, it is occasionally eaten as food, just as olive oil is eaten, but so rarely that we lay no stress upon that fact; but the evidence shows without contradiction that for shortening purposes, and as a grease in cooking, it is often used by bakers and householders just as lard is used, and, still further, that without being refined, or undergoing any chemical change, it is the principal ingredient of oleomargarine. In manufacturing this substitute for butter, oleo oil is mechanically mixed by churning with other substances, such as milk, a little butter, salt, neutral lard, or cotton seed oil. What the oleo oil was before the mixing, it continues to be afterward, and there can be no doubt that the mixture is fit for human consumption and is largely used for food. The oil has probably some industrial uses also, although the evidence is not very clear on this point; but we think there can be no reasonable question that its chief use is to be the base of oleomargarine. Of this substance it constitutes more than 50 per cent. As a food product, we see no essential difference between oleo oil and lard, and it can hardly be questioned that lard is a food. Nor, indeed, do we see any essential difference as a food between olive oil and oleo oil. The former is probably more palatable, and is more often used alone; but its chief use is to be mixed with other foods

for flavoring purposes. Obviously, the fact that the oleo oil has not been cooked is not decisive. A raw egg is food before as well as after it is mixed with the other ingredients of a salad dressing; and lard is food before as well as after it is mixed with flour and water. Indeed, to our minds the proposition under discussion seems so evident that we find some difficulty in giving reasons to support it. Congress has excluded from interstate and from foreign commerce all uninspected meat food products, and as this was within the legislative power the duty of the court is to enforce the law.

If this conclusion is sound, the other questions considered below and argued here cease to be important. Being a meat food product, the plaintiff's oleo oil could not be carried in interstate or in foreign commerce—in this case, to Holland—without previous inspection, and, as the shipment that gave rise to the dispute had not been inspected, the defendants were justified in the course of conduct they pursued.

As a final word we may add that the Melting Company does not make oleomargarine, and does not knowingly sell oleo oil directly to such manufacturers, either here or abroad. What is done with the oil after it reaches the consignees in other states, or in other countries, is a matter beyond the company's control. But, of course, this consideration is not decisive. Congress has chosen to forbid interstate and foreign commerce in meat food products, unless they have previously been inspected here, and, as we have already pointed out, the question before us now is merely one of legislative power and of statutory construction. We may also say that the Department's regulations permit shipments of oleo oil after it has been "denatured"—i. e., so treated by the addition of some substance (for example, power distillate, a petroleum product) as to prevent its use as a food while leaving its value for industrial purposes practically unimpaired. We refer to these matters to show that they have not been overlooked; they do not affect the course of the argument or the conclusion we have reached.

The decree is reversed, with instructions to dismiss the bill.